· WEST SIDE IRR. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit.   October 15, 1917.) ·

No. 2866.

1. WATERS AND WATER COURSES ☞158½(1)—APPROPRIATION—DIVERSION—CONTRACTS.

In a suit by the United States to enforce the terms of a contract entered into by defendant, which provided that it should not divert more than 80 cubic feet of water per second from a stream, evidence *held* insufficient to sustain defendant's contention that its officers and stockholders did not understand the terms of the contract and executed it through mistake.

2. WATERS AND WATER COURSES ☞158½(2)—CAUSE OF ACTION.

The Reclamation Service of the United States, having promulgated a scheme to increase largely the supply of water of a river for irrigation purposes by constructing storage works for the purpose of impounding surplus water in the winter months and distributing it during the irrigation season, induced rival appropriators of water, one of whom was de-

fendant, to specify the amounts of water which they diverted, it appearing that all of the natural flow of the stream had been appropriated so the amount of the surplus could be determined. After the construction of reservoirs defendant appropriated water in excess of the amount specified in the contract, whereupon the United States filed a complaint, alleging that the excessive diversion by defendant during the low-water season directly contributed to the shortage in the natural flow available and unlawfully diminished the amount of stored water which plaintiff had contracted to deliver to persons and corporations, and, further, that there were vast areas of semiarid land which would be rendered permanently useless, or of far less value unless plaintiff could carry out its plan of disposing of the natural flow of the stream in conjunction with the stored waters. *Held,* that the complaint was sufficient to state a cause of action.

3. WATERS AND WATER COURSES ⊕⊃158½(2)—ACTIONS TO RESTRAIN DIVERSION —RIGHT TO MAINTAIN.

   In such case, the United States, having constructed large irrigation works, pursuant to Reclamation Act June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1916, §§ 4700–4708), and having become an appropriator of water and purchaser of other appropriations, has sufficient interest to maintain the suit.

4. WATERS AND WATER COURSES ⊕⊃158½(1)—RECLAMATION—AGREEMENTS.

   Where the Reclamation Service of the United States, being desirous of reclaiming a large area of semiarid lands by increasing the waters of a stream available for irrigation by storing the same during the winter months for use in the irrigation season, induced prior appropriators, all of the waters of the stream having been appropriated, to execute agreements stating the amount to which they were entitled, defendant, one of the appropriators, cannot, the United States, in reliance on such agreements, which were necessary to determine the flow of water to which the appropriators were entitled, having constructed vast reclamation works, avoid compliance with the contract on the theory that it was not an agreement and had not been executed.

5. CONTRACTS ⊕⊃346(1)—DEFENSES—PLEADING.

   Defendant, in suit to enforce contract, cannot set up a defense not pleaded.

6. CORPORATIONS ⊕⊃426(2)—STOCKHOLDERS—RATIFICATION.

   Stockholders can ratify any act of a corporation which they might have authorized in the first instance, including acts done by the directors outside the scope of their powers.

7. CORPORATIONS ⊕⊃426(7)—"RATIFICATION"—ACQUIESCENCE.

   Acquiescence by stockholders after such a length of time and in such circumstances that knowledge of acts done by the directors beyond their authority will operate as a "ratification."

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ratification.]

8. CORPORATIONS ⊕⊃426(7)—AUTHORITY OF OFFICERS—"RATIFICATION."

   The adjustment of conflicting claims of appropriators of water from a river being a necessary condition to the consummation of a reclamation project of the United States, defendant, a mutual irrigation company, which diverted water from such river, under resolution of its directorate, which was authorized to contract for the sale of water and had executed mortgages without authority from the stockholders, executed an agreement, limiting its claim to specified quantities. Though all of its stockholders knew of the contract, they did not then disavow the authority of the directors, but remained silent while the government proceeded with the work, making vast outlays of money, in the belief that all disputes had been settled. Thereafter the stockholders, by resolution after a dispute with the Reclamation Service, asserted their right to a greater quantity

---

⊕⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of water than that specified in the contract, and authorized suit to enforce their rights, but none was brought. *Held*, that by failure of the stockholders to disavow the unauthorized acts of the corporate officers and give notice of the disavowal to the government, they and the corporation were precluded from questioning the authority of the officers, or the validity of the contract; the acquiescence of the stockholders amounting to a ratification of the contract.

9. WATERS AND WATER COURSES ☞158(1)—DIVERSION—APPROPRIATION—CONTRACTS.

Where defendant, a mutual irrigation company, executed a contract with the government limiting its appropriation of water, and the government proceeded with a reclamation project based on such contract, defendant cannot defeat the contract on the theory that it should not be construed as an abandonment of rights of its stockholders, because to constitute abandonment of a water right there must be an intent to abandon and actual relinquishment.

10. WATERS AND WATER COURSES ☞137—APPROPRIATION—ADVERSE USE.

Defendant's appropriations of water in excess of amounts to which it was entitled under contract with the government, having continued for less than 10 years before suit, defendant acquired no adverse rights to water so taken.

Appeal from the District Court of the United States for the Southern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Bill by the United States against the West Side Irrigation Company, filed September 26, 1913. From a decree for the United States (230 Fed. 284), defendant appeals. Affirmed.

The appellant is a corporation organized in the year 1889, under the laws of the territory of Washington, to construct and maintain a canal for the purpose of conveying water from the Yakima river and distributing the same for the use and benefit of its stockholders, who are farmers. It appeals from a decree of the court below which enjoined it from diverting by means of its canal more than 80 cubic feet per second of the water of the river. The suit was brought to enforce the terms of a contract executed by the appellant on October 21, 1905, which provides as follows:

"Whereas, the Reclamation Service of the United States has been requested to investigate the water resources of the Yakima watershed with a view to the further development and increase of irrigation therein, under the provisions of the act of Congress approved June 17, 1902 (32 Stat. 388), known as the Reclamation Act, and whereas the officers of the Reclamation Service in preliminary investigation have found that in all the low-water flow of the Yakima river and its tributaries has been appropriated and is now being diverted by the various canals within said watershed and that in order to irrigate additional lands within said watershed it will be necessary to store the surplus waters of the flood season, and whereas, no irrigation project to be undertaken by the United States within the said watershed can be recommended as feasible unless the quantity of water to which each present user from the Yakima river and its tributaries is entitled be first definitely ascertained and agreed to; and whereas, the undersigned claim certain quantities of water from the Yakima river and its tributaries and are willing to limit their claim to the said waters to the quantities of water designated in the following schedule:

"Schedule. Cubic Feet per Second. April to August, inclusive, 80. September, 80. October, 34.

"Now, therefore, in order to avoid litigation, to encourage the storage of water in the Yakima watershed and to secure the indirect benefit derived from further irrigation through federal enterprise, each subscriber to this agree-

ment or to a copy thereof, differing only as to the quantities of water specified, agreed to limit and does limit its respective rights of appropriation from said Yakima river and its tributaries to the above-specified amounts, provided, that it is hereby understood and agreed that the limitation of water rights as herein specified is made as a compromise, in order to secure the benefits above referred to and shall not bind any party hereto in any event, unless the determination to construct storage and irrigation works by the United States under the Reclamation Act shall be announced by the Secretary of the Interior within two years from the date upon which he is furnished with properly authenticated copies of the agreements of this form duly executed by or on behalf of such proportion of the claimants of the waters of the Yakima river and its tributaries as shall be satisfactory to the Secretary of the Interior. In witness whereof, the undersigned has caused these presents to be executed in its corporate name, by its president, and attested by its secretary, and its corporate seal to be affixed, by authority of its board of directors, heretofore duly made and entered this 21st day of October, 1905.

"The West Side Irrigation Company,
"By Mitchell Stevens, Vice President."

The appellant answered, admitting the execution of the contract, but alleging that it was not intended to be, and was not, a relinquishment of any of the rights of the appellant's stockholders, and was not executed for the purpose of prejudicing the right to water which was being beneficially applied to the irrigation of the lands of the shareholders; that it was the intention of the officers of the appellant in making the agreement to place the amount of water claimed by the shareholders in the amount which the lands of the shareholders required for successful irrigation, and it was not the intention that they should be deprived of that right; that the agreement was signed with the understanding that the rule which the appellant had theretofore employed in measuring and delivering water to its stockholders should apply, and that the appellant then had no knowledge as to the amount of water which was necessary to divert from the river in order to supply the full amount of water to which its shareholders were entitled at the point of use; but the sole knowledge they had was their custom of measuring and delivering the water at the points of use; that according to their custom the water which was necessary to supply the stockholders was one inch of water per second of time per acre, measured under a five-inch pressure at the point of delivery to the land.

H. J. Snively, of North Yakima, Wash., for appellant.

Francis A. Garrecht, U. S. Atty., of Spokane, Wash., and E. W. Burr, Sp. Asst. U. S. Atty., of North Yakima, Wash.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The appellant was one of a large number of the users and appropriators of the waters of the Yakima river who executed like contracts at the same time, and under similar circumstances. At the time when the Reclamation Service promulgated a scheme to increase largely the supply of water of the Yakima river for irrigation purposes, more than all the natural flow of the river during the irrigation season had been covered by appropriations. It was not the purpose of the Reclamation Service to use any of the natural flow of the river. It was the intention to construct storage works for the purpose of impounding the surplus water of the winter months and distribute it during the irrigation season. To do this it was necessary to know the amount of the natural flow and to determine and specify just what proportion

each appropriator had the right to use. At that time litigation was pending between rival appropriators. The Reclamation Service sought to adjust all differences and induce all appropriators to enter into an agreement whereby the amount of water that each should divert from the river should be definitely determined and recorded. Public meetings were called for that purpose, and the agreements were finally entered into. By the terms of the contracts all water was measured at the intakes and in cubic feet per second instead of in miners' inches. The appellant was called upon to state the quantity of water which it was using. It placed it at 4,000 miners' inches, a quantity which was taken by all parties to be the equivalent of 80 cubic feet per second. With that understanding the agreements were executed.

[1] The appellant now contends that 80 cubic feet per second diverted from the river is not the equivalent of the 4,000 miners' inches which its stockholders had been accustomed to use, and as they had measured it; that they had measured it at the points of delivery and not at the intake, and under a pressure which in fact delivered to them 90.4 cubic feet per second, and that by seepage from the canal, which is several miles in length, 14 cubic feet are necessarily lost and returned to the river before delivery to the stockholders, and that therefore they are entitled to take from the river that which they took before the agreement was made, which they say was 104.4 cubic feet per second. To this it is to be said that not only was there lack of pleading, but there is lack of evidence to sustain the contention that the officers of the appellant and its stockholders did not understand and assent to the terms of the contract. Two of the stockholders testified that it was their understanding that the 80 cubic feet was the equivalent of the 4,000 inches of water which they had measured at the places where it was delivered, but there is no evidence that their understanding was made known to the officers of the Reclamation Service before the execution of the contract. There was a resolution of the board of directors of the appellant that the president and secretary be instructed to sign contracts with the government to accept 80 cubic feet of water per second from April 1st to October 1st, and 34 cubic feet from October 1st to November 1st of each year, "as the West Side Irrigation Company's appropriation of waters of the Yakima river, providing that the government completes the Yakima river irrigation project." The plain meaning of that resolution is that the 80 cubic feet per second was the measure of water to be taken from the river, and not the measure of water to be delivered on the farming lands. It is not denied that Noble, the district engineer in charge of the reclamation project, stated at a public meeting preceding the execution of the contract that the ditch owners would have to settle definitely upon a given amount of water which would be diverted by each of their canals, and that would have to be such a figure in each case that the total would not exceed the flow of the river, and he testified that that total amount had been measured by certain gauge stations, one on each canal, placed as near the head thereof as conditions would permit. There was evidence also that the Reclamation Service had taken measurements, covering a period of two years, of the amount flowing into each canal, and that in 1904 the amount diverted by the appellant was

less than 70 cubic feet per second, and that in 1905 it was very close to 75 cubic feet per second.

[2] We find no merit in the contention that the complaint is insufficient to state a cause of action, in that it does not show that the United States, or any one in privity with it, has been deprived of the use of water, or has sustained a present injury. The complaint alleged that excessive diversion by the defendant during the low-water season directly contributes to the shortage in the natural flow available to plaintiff, and unlawfully diminishes the amount of stored water which the plaintiff has contracted for delivery to persons and corporations. The complaint proceeded to specify contracts which it had made, and alleged that:

"There are vast areas in the valley of the Yakima river of arid and semiarid land incapable of producing satisfactory crops which will be rendered either permanently useless or of far less value, unless plaintiff may, in pursuance of its rights as aforesaid, carry out its plan of disposing of the natural flow of the Yakima river in conjunction with waters stored in plaintiff's reservoirs."

There was no demurrer to the complaint, and in addition to the facts alleged therein it was stipulated between the parties that the United States has constructed an irrigation system for the beneficial use of water for 124,500 acres of land.

[3] Also without merit is the contention that the United States has no authority to maintain the suit. The United States, according to the allegations of the complaint, is an appropriator of water, and a purchaser of other appropriations of water from the Yakima river for use in irrigation projects, and it clearly has the right to protect, not only those interests, but also the whole project and scheme of reclamation which it has undertaken under the authority of Congress by the act of June 17, 1902, known as the Reclamation Act. United States v. Union Gap Irr. Co. (D. C.) 209 Fed. 274. The appellant cites In re Celestine (D. C.) 114 Fed. 551, which denies the authority of an Indian agent to sue for the benefit or protection of the Indians under his charge, but the same decision affirms the right and duty of the government to maintain such suits, and that right and duty are affirmed in Heckman v. United States, 224 U. S. 413, 437, 32 Sup. Ct. 424, 56 L. Ed. 820, and Bowling v. United States, 233 U. S. 528, 534, 34 Sup. Ct. 659, 58 L. Ed. 1080.

[4] It is contended that the instrument so executed by the appellant is not binding upon the appellant or its stockholders; that it was not in the nature of an agreement, but at most amounted to a declaration in the nature of an abandonment founded upon mistake, and which was never acted upon by the United States or anybody, to their injury. But the appellant and its stockholders received a consideration for the execution of the agreement. They received the benefit of the adjustment of all conflicting water rights, and the benefit of the expenditure by the United States of a large sum of money in the county in which their lands are situated, and, on the other hand, the United States, relying upon the agreement so made, entered upon the execution of the reclamation scheme and therein, at the time of the commencement of the suit, had expended for construction and reclamation $6,866,500.

[5] The suggestion that the agreement was founded upon mistake cannot avail the appellant. There is no evidence whatever that there was a mutual mistake. And there is no convincing evidence of a mistake on the part of the appellant or its stockholders. And if, indeed, there was a mistake on their part, they waived the right to assert it by their subsequent silence. There is no plea of mistake in the answer to the complaint. The whole defense of the appellant as pleaded rests upon its construction and conception of the terms of the agreement itself.

[6-8] The appellant contends that its officers who signed the agreement of October 21, 1905, had no authority to bind the stockholders thereby, since the appellant was a corporation organized as a distributing agency by farmers to distribute water to themselves without profits other than the use of water, the result being that each shareholder owns a proportionate amount of the water in the canal, of which his shares of stock are merely evidence of title, and the appellant invokes the doctrine that the directors of a mutual water company have no authority to release or surrender any part of the physical property of the company, or to divert from the ditch, or waste any of its appropriated water, citing Stuart v. Davis, 25 Colo. App. 568, 139 Pac. 577, and Caviness v. La Grande Irrigation Co., 60 Or. 410, 119 Pac. 731. The answer to this contention is twofold: First, that no such defense is pleaded in the answer; and, second, that the stockholders gave no notice to any officer of the United States that they repudiated the contract, but, on the contrary, by their silence they ratified the same. The evidence is clear that all of the shareholders of the appellant knew of the contract of October 21, 1905, and of the negotiations which culminated in its execution. No action was taken by the stockholders to challenge the agreement until December 4, 1909, when, owing to a dispute between the Reclamation Service and the appellant as to the amount of water appropriated by the latter, a resolution was adopted, reciting that:

"Whereas the canal has been enlarged until it safely carries 5,000· miners' inches of water, measured under four and one-half inch pressure, said measurement being made at the several points of diversion of the laterals from the main canal; and, whereas, said five thousand inches of water, when economically used are necessary for the profitable irrigation of the lands"

—and authorizing the trustees to bring suits to secure the full legal rights of the stockholders to the water. But no suit was brought. The by-laws of the company authorized the trustees to "enter into contracts for the sale of water." It was shown prior to making the agreement in question, the trustees had executed mortgages upon the canal water rights without authority from the stockholders. Relying upon the agreement of October 21, 1905, the United States expended large sums of money on the reclamation project. To this state of facts the following citation in the appellant's brief is appropriate:

"Ultra vires acts of directors do not bind the corporation or the stockholder unless ratified, or unless circumstances of equitable estoppel exist." 3 Thompson on Corporations, § 3999.

Stockholders can ratify any act of the corporation which they might have authorized in the first instance, including constituent acts done by the directors outside the scope of their powers. 10 Cyc. 1073. And acquiescence by the stockholders after such a length of time, and such condition of circumstances, that knowledge is to be inferred, will operate as ratification. 10 Cyc. 1076; Thompson v. Lambert, 44 Iowa, 239; Merchants' & Farmers' Bank v. Harris Lumber Co., 103 Ark. 283, 146 S. W. 508, Ann. Cas. 1914B, 713; Pollitz v. Wabash R. R. Co., 207 N. Y. 113, 100 N. E. 721; Hill v. Railroad, 143 N. C. 539, 55 S. E. 854, 9 L. R. A. (N. S.) 606; Alexander v. Searcy, 81 Ga. 536, 8 S. E. 630, 12 Am. St. Rep. 337.

[9, 10] The appellant asserts that the agreement should not be construed as an abandonment of any of the rights of its stockholders, that abandonment is a question of fact and intent, and that there was no intention to abandon needed water, and it cites authorities to the proposition that, to constitute abandonment of a water right, there must be a concurrence of the intention to abandon, and an actual relinquishment of use. It adverts to the fact that after the agreement the stockholders continued to use the water as before. But the case presents no question of abandonment. It presents only a written instrument and the meaning of its terms. That instrument is definite, and void of ambiguity. It was made in pursuance of the express authority of a resolution of the appellant's directors, and one of the stockholders testified that it was made for the purpose of giving the government a definite and certain figure which it could rely upon as the appellant's right in the appropriation of the water. The use of the water by the appellant and its stockholders after the agreement was made was not continued for a sufficient period to create any adverse right as against the terms of the agreement. Spring Hill Irr. Co. v. Lake Irr. Co., 42 Wash. 379, 383, 85 Pac. 6; Barnes v. Belsaas, 73 Wash. 205, 131 Pac. 817.

The decree is affirmed.